**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Criminal No. 06-004 (HHK)** |
| | : | |
| **v.** | : | |
| | : | |
| **ROBERT L. HALL, JR.** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S CONSOLIDATED MEMORANDUM IN AID OF SENTENCING**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits its consolidated memorandum in aid of sentencing. Defendant's offense level under the United States Sentencing Guidelines is offense level 38 which yields an advisory Guideline range of 235-293 months in custody.[1]

For years defendant used his specialized knowledge, intellect, and charm to deceive, defraud, and betray the trust of hundreds of innocent investor victims, many of whom lost some or all of money that had taken a lifetime to save. Defendant exploited for his own personal gain the most treasured personal values of his investors: their religion, their families, and their belief in racial and economic justice. Defendant's cruelty knew no limitations: he victimized people of different ages, different races, different economic and social backgrounds, different genders, and different geographic regions.

---

[1] This memorandum also addresses defendant's conduct in case number 06-004, in which defendant pleaded guilty to conspiracy, two counts of bank fraud, three counts of mail fraud, three counts of money laundering, and one count of first degree fraud. Because this bank fraud scheme was committed during the course of defendant's scheme to defraud FUFG investors in case number 05-30, the additional $90,000 loss defendant caused in the bank fraud scheme should be considered relevant conduct but would not impact defendant's offense level as calculated in case number 5-30.

The evidence at trial in case number 05-30 established beyond any doubt that defendant is a highly dangerous economic predator and an inveterate liar who has no immediate prospect of rehabilitation. Only a sentence within the applicable Guideline range of 235-293 months in prison will reflect the true seriousness of defendant's crimes, provide just punishment for the multiple offenses, promote respect for the law, and protect the public from future harm by defendant.

## I. **Facts Established at Trial**

At trial, the government established beyond a reasonable doubt the truth of each of the 18 counts set forth in the grand jury indictment. A brief summary follows.

Defendant owned and operated a company known as First United Financial Group (FUFG). FUFG's offices were located at 240 Parker Street, N.E., in the District of Columbia. Defendant Hall also used 240 Parker Street, N.E., as his residence. FUFG's stated business objective was to solicit money from individuals in order to invest that money in certain District of Columbia real estate ventures and promise these individuals a specific above market rate of monetary return. Defendant's title was the Chief Executive Officer (CEO) and Managing Member of FUFG. As such, Hall had absolute authority over all FUFG bank accounts and business transactions.

As part of his job activities, defendant would directly solicit investors and make representations concerning guaranteed return of investor principal and promised rates of return. In his capacity as CEO and owner of FUFG, Hall had access to and signatory authority over all FUFG bank accounts and would make withdrawals and transfers on behalf of FUFG. Defendant Hall also delegated these activities to subordinates at FUFG. Co-schemer Carletus Willis was the Chief

Operating Officer (COO) of FUFG and was in charge of running the day-to-day operations of the business. Mr. Willis reported directly to defendant Hall.[2]

From between in or about February, 2001, until in or about October, 2003, in the District of Columbia and elsewhere, defendant Hall, Carletus Willis, and others, knowingly devised a scheme and artifice to defraud and to obtain money and property of FUFG investors of over $1 million by means of false and fraudulent pretenses and representations. The purpose of the scheme was for defendant and others, to unlawfully enrich themselves by fraudulently obtaining monies from FUFG investors by operating a pyramid, or Ponzi scheme. The scheme operated as follows:

a. FUFG would promote its investment offerings using a website, mailings, seminars, "cold calls," newspaper advertisements, radio ads, and commissioned sales agents. Hall would contact potential investors in person, by telephone, by facsimile, or by United States mail sent from FUFG's office in the District of Columbia.

b. Hall purposely misled FUFG investors by telling them that their funds would be used to invest in a real estate venture called "The Trinidad Project," which Hall promoted as an authentic urban redevelopment project in the Trinidad area of Northeast Washington, D.C. In truth and in fact, FUFG never invested in the Trinidad Project or in any other real estate venture.

c. Hall recruited investors by telling them falsely that their investments would receive above-market rates of return.

---

Mr. Willis pleaded guilty before the Court on December, 20, 2004, to one count of conspiracy and one count of mail fraud and was sentenced on June 1, 2006. Mr. Willis entered an early plea and cooperated with the government's investigation and prosecution of Mr. Hall.

d.  Hall told investors that the promised rates of return would be derived from profits on investments that FUFG made from real estate investments.  In truth and in fact,  FUFG had never been profitable and had no investments from which to generate returns of any kind.

e.  Hall guaranteed investors that their principal investment was safe and that it would be returned on or before a specified time, when in truth and in fact, Hall knew that these representations were false..

f.  Hall and each investor would enter into a signed investment agreement known as an "Asset Placement Agreement," or a "Capital Placement Agreement" which memorialized the amount invested, investment term, and promised rate of return.

g.   Relying on the false representations made by Hall, FUFG clients would enter into these agreements with FUFG and would provide thousands of dollars to FUFG under the belief that it would be invested in real estate or other legitimate business ventures and that their principal was guaranteed.  Clients would often make these payments to FUFG's bank account by interstate wire or by bank check that they would send to FUFG's Washington, D.C., address through the United States mail.  Investor funds were not segregated in any way, but were pooled in one or more FUFG bank accounts.

h.   Under the direction and supervision of Hall, FUFG issued false and misleading account statements to FUFG investors that would falsely reflect gains and reinvestments that did not exist.

i.  Hall caused FUFG to make occasional payments to certain FUFG investors (those early investors at the top of the pyramid) in order to lull them into believing that their investments were safe and secure.  In truth and in fact, the payments did not come from profits derived from any FUFG

business transactions or investments.  Rather, the payments came from other investor funds received by FUFG (generally, those individuals at the bottom of the pyramid).

j.  Defendant did not file any federal income tax returns on behalf of FUFG or himself individually, thereby concealing the scheme and his actions in furtherance of his theft of investor funds.

II.  **Defendant's offense level is 38 and he should be sentenced on that basis.**

A. Loss in this case is at least $2,519,386.

1. *Defendant's Total Loss Figure Should Be Calculated According to the Intended Loss Rather than Actual Loss.*

The application note for § 2B1.1(b)(1) states that in a case involving a Ponzi scheme, "loss shall not be reduced by the money . . . transferred to any individual investor in the scheme in excess of that investor's principal investment." U.S.S.G. § 2B1.1 cmt. n.2(F)(iv) (2002).  Thus, Mr. Hall is not entitled to any credit against losses under the Guidelines.  Several circuits have held that the loss calculation in a Ponzi scheme should not be offset by the amount of the victims' recovery.  See United States v. Deavours, 219 F.3d 400, 403 (5th Cir. 2000) (no loss reduction where defendants returned money to Ponzi scheme victims in order to continue criminal activities rather than to extricate themselves from wrongdoing); United States v. Lauer, 148 F.3d 766, 768 (7th Cir. 1998) (amount of intended loss in a Ponzi scheme is the total amount the defendant placed at risk); United States v. Carrozzella, 105 F.3d 796, 805 (2d Cir. 1997) (finding of loss that includes total known deposits scheme is not clearly erroneous since the return of money as interest or other income is necessary for the continuance of the scheme), *abrogated on other grounds by* United States v. Berg, 250 F.3d 139 (2d Cir. 2001); United States v. Loayza, 107 F.3d 257, 266 (4th Cir. 1997) (no loss

reduction for returned money since payments are vital to the longevity of a Ponzi scheme); *but see* United States v. Holiusa, 13 F.3d 1043, 1046-47 (7th Cir. 1994) (holding that intended loss in a Ponzi scheme case did not include amounts ultimately returned to investors).

The Fourth Circuit's decision in Loayza clearly illustrates this rationale: an "approach which holds a defendant responsible for the amount of loss which was intended, not the actual loss ultimately sustained, is appropriate in cases where the payments are vital to the longevity of the scheme." United States v. Loayza, supra, 107 F.3d at 266. Loayza participated in a Ponzi scheme in which the scheme took in a total of $643,575.14 in gross revenues. In analyzing the issue of loss under the Guidelines, the Fourth Circuit opined:

> [D]uring the course of the preparation of the scheme, around $98,000 was returned to the defrauded investors clearly for the purposes of continuing to defraud them, to perpetuate the scheme. So it was not returned out of any good faith change of mind or any concern about restoring something to the victims, but merely to perpetuate the scheme. . . . It just does not appear to the court that this defendant ought to be able to profit from monies that just happened to be back in the victim's hand while he was perpetuating the scheme because he never had any intent for them to keep the money. It was all designed so that he could continue to steal money from his victims.

Id. (quoting J.A. at 404-05). See also United States v. Mucciante, 21 F.3d 1228, 1238 (2nd Cir. 1994) (declining to adopt a "net loss" theory in a Ponzi scheme case; although the defendant returned some money and repaid some victims, "he did so as part of a meretricious effort to maintain their confidences. He is therefore not entitled to credit for sums returned, or for sums spent for [the first victim's] benefit.") (citations omitted); United States v. Munoz, 233 F.3d 1117, 1125 (9th Cir. 2000) (defendants' sentence should be determined according to "the entire sum of money that the schemers put at risk through the misappropriation regardless of whether some victims were fortunate enough to recover part of their losses. . . . Because the schemers typically return money to investors to

perpetuate the fraud and ensnare new investors, and not to mitigate damages to the current investors, these courts reason that they should be held accountable for all of the funds that are misappropriated.").

The D.C. Circuit has not spoken directly on the appropriate method for calculating loss in a Ponzi scheme but it has openly rejected methods that calculate net rather than total intended loss. See United States v. Bae, 250 F.3d 774, 777 (D.C. Cir. 2001) (agreeing that the Guidelines should lead courts to "'hesitate[ ] to engage in net loss calculations'"). In addition, the D.C. Circuit has recognized that the Guidelines require courts to apply the larger amount where a defendant convicted of fraud intends to take a greater amount than he succeeds in taking before the fraud is detected. See United States v. Bolla, 346 F.3d 1148, 1151 (D.C. Cir. 2003) (affirming the trial court's application of intended loss rather than actual loss); United States v. Studevent, 116 F.3d 1559, 1561 (D.C. Cir. 1997) (same).

Here, defendant's Ponzi scheme took in $1,394,234 from FUFG investors. See Sentencing Ex. 1, attached hereto[3], and Gov't Trial Ex. 1a. This sum represents all identified principal investments received by the defendant during the execution of his scheme. Any payments defendants made to FUFG investors were proceeds obtained from other defrauded investors. Moreover, defendant only made these payments to early investors to maintain their confidences, ward off

---

Sentencing Exhibit 1, attached hereto, sets forth the methodology the government uses to arrive at its loss figures. Sentencing Exhibit 1 was prepared by Postal Inspector Judy Ramos for sentencing and is based principally on two exhibits that were introduced at trial, Government's Trial Exhibits 1a (entitled, "All Identified Investment Deposits") and 2j (entitled, "Proposed Rates of Return for Testifying Investors"). In preparation for trial, the government provided the Court and defendant with a complete set of the government's trial exhibits so we do not separately attach trial exhibits to this memorandum. We do, of course, retain the original exhibits that were introduced into evidence at trial and those are available for inspection should the Court or defendant desire.

complaints and to lure additional investor/victims. By using the defendant's intended loss rather than actual loss, the Court refuses to reward the defendant for payments which were made only as a ploy to entice further investment and conceal his fraud.

In addition, any payments made by the defendant after the scheme was detected are inapplicable for the purposes of calculating loss. According to the Guidelines, any payments made after the offense was discovered by a government agency will not be deducted from his loss figure. See U.S.S.G. § 2B1.1 cmt. n.3(E)(i). Thus, the defendant is not entitled to any credit for payments made to investors after the October 2003 search warrant.

In sum, using the total known funds taken by defendant is the only true method of holding the defendant accountable for his fraud. Given the defendant's total loss figure of $1,394,234 (not including unpaid, contracted-for interest), his base offense level should be increased by at least 16 levels.

> 2. *The Total Intended Loss Should Also Include Interest Promised as Part of the Ponzi Scheme.*

Loss should also include the promised rate of return of which FUFG investors were deprived. While the Guidelines prohibit the inclusion of interest in loss calculations, it is important to distinguish interest fees attributed to the amount owed by the defendant and unpaid interest, contracted-for by the defendant himself.

Here, it is completely appropriate to include the latter form of interest owed by the defendant. In United States v. Lowder, 5 F.3d 467 (10th Cir. 1993), the district court included in its loss calculation, over $70,000 in interest due to investors. The defendant in that case had solicited investments from a number of unsophisticated clients, guaranteeing them a 12% return. The funds

were never invested, however, but used by the defendant for personal expenses. To disguise his fraud, Lowder sent fraudulent account summaries to investors which represented that interest was accruing at the guaranteed rate. The Seventh Circuit affirmed Lowder's sentence after finding that "[h]e induced their investment by essentially contracting for a specific rate of return." Id. at 470-71.

Numerous other circuits have followed Lowder in concluding that the loss to victims includes interest promised as part of the fraud scheme. See, e.g., United States v. Sharma, 190 F.3d 220, 227-28 (3rd Cir. 1999) (bargained-for interest can be included in loss calculation under the Guidelines); United States v. Nolan, 136 F.3d 265, 273 (2d Cir. 1998) (unpaid, agreed-upon interest can be included in loss calculation under section 2F1.1); United States v. Porter, 145 F.3d 897, 901 (7th Cir. 1998) (unpaid interest which investors reasonably expected to receive is properly included in loss valuation); United States v. Henderson, 19 F.3d 917, 928-29 (5th Cir. 1994) (interest on fraudulently procured loan can be included in loss calculation if there is a reasonable expectation of receiving that interest).

The Lowder court's approach to loss calculation has been described by the Tenth Circuit as "rest[ing] on the premise that, when a particular return is promised, victims are legally entitled to it." United States v. Aptt, 354 F.3d 1269, 1278 (10th Cir. 2004). The Aptt decision involved a Ponzi scheme where the defendants defrauded investors of almost $14 million "by promising them exorbitant returns, including periodic 'Double Your Money' offerings bearing a staggering 100% interest rate." See id. at 1273. The trial court included $2.9 million in promised but unpaid interest in the defendants' total loss calculation. See id. at 1277. Citing, Lowder, the Tenth Circuit affirmed the trial court's calculations stating that "the proper measure of damages includes any amounts promised but unpaid." Id. at 1278. The court further reasoned that unpaid interest would be

included in the loss calculation in a breach of contract action, thus there is no reason not to include unpaid interest in fraud cases as well. See id.; see generally United States v. Szeja, 127 Fed. Appx. 890, 892 (7th Cir. 2005) ("We typically do not permit generalized expectations of profit or appreciation to enter into a guideline loss calculation. . . . But where the defendant makes specific representations about a property's value or promises the victim a particular return on an investment, the defendant's own valuation can be used to calculate loss at sentencing.") (emphasis added) (citation omitted).

There is no principled distinction between cases like Lowder and Aptt on the one hand and Hall on the other. Mr. Hall defrauded his investors by promising them an average monthly rate of return of 11.53%. See Sentencing Exhibit 1.[4] The defendant created, distributed, and executed contractual agreements with investors in which he formally contracted for these rates of return. See, e.g., Trial Exhibits 9a (Asset Placement Agreement ("APA") with Denise Dicks-Cook), 12a (APA with Walter Boone). There is no ambiguity in either the contracts themselves or the testimony of FUFG investors: defendant made explicit promises to FUFG investors concerning specific rates of return and dates on which investors could expect to receive their money. It is axiomatic that he should now be held firmly to these explicit promises.

Given that the defendant used the contractual promise of high rates of return to lure unsophisticated investors into his fraud scheme, the Court can – and should – include an additional

_____

This monthly rate of 11.53% – 138.4% annually – is based on the figures set forth in Government's Trial Exhibit 2j. It is important to note that the rate of return reflected in Trial Exhibit 2j *is less than* the rate of return reflected in Trial Exhibit 2g which summarizes the 153.6% annual interest rate defendant promised to all FUFG investors. For purposes of calculating loss for sentencing, we have presented the more conservative analysis set forth in scenario 2 of Sentencing Exhibit 1.

$1,125,152 in unpaid, contracted-for interest to the defendant's loss calculation. <u>See</u> Sentencing Ex.

1. By including this sum, the defendant's total loss in case number 05-30 is $2,519,386. <u>See id.</u>,

scenario 2. Thus, his base offense level should be increased by 18 levels, not 14 as suggested by the

PSR.[5]

    B. <u>A four level enhancement applies because defendant's scheme involved more than 50 victims.</u>

U.S.S.G. section 2B1.1(b)(2)(B) provides: "If the offense – involved 50 or more victims,

increase by 4 levels." At trial, the government established that defendant defrauded <u>at least 70</u>

individuals[6], including 10 who testified as government witnesses at the trial. Government's Trial

Exhibits 1a and 44 sets forth the names of each of these victims and the amount of money each of

these investors lost as a result of their business relationship with FUFG. <u>See</u> Gov't Trial Ex. 1a, 44.

    C. <u>Defendant's abuse of a position of private trust merits a two level enhancement.</u>

Under Section 3B1.3 of the Guidelines, a sentencing court must increase a defendant's

offense level by two levels if the defendant "'abused a position of public or private trust . . . in a

manner that significantly facilitated the commission or concealment of the offense.'" U.S.S.G.

§3B1.3. The Guidelines describe this section as applying to positions of public or private trust

---

    As set forth, <u>supra</u>, n.1, the Court should add to the total loss figure the $90,000 that defendant stole from Sterling Trust Company in case number 06-004. Adding this $90,000 would, however, have no impact on defendant's total offense level. The Court can and should consider these additional crimes when determining where within the applicable Guideline range to sentence the defendant.

    This is a highly conservative estimate. Many investors who sent FUFG money and apparently lost money did not respond to inquiries made by law enforcement officials in connection with this investigation and they are not included in this calculation. Also, the Court will recall that defendant called as defense witnesses several individuals who lost substantial amounts of money to defendant's fraud scheme. None of these individuals is included in the government's calculation of the number of victims.

"characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference.)"  U.S.S.G. Commentary § 3B1.3, Application Note 1.

The district court must determine whether the defendant: (1) occupied a position of trust and (2) abused that position in a manner that significantly facilitated the commission or concealment of the offense.  United States v. Broumas, 69 F.3d 1178, 1181 (D.C. Cir. 1995), cert. denied, 517 U.S. 1148 (1996) (quoting United States v. West, 56 F.3d 216, 219 (D.C. Cir. 1995)).  In order to determine whether a position is one of trust, the D.C. Circuit suggests the trial court consider: "[t]he extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed; defendant's duties as compared to those of other employees; defendant's level of specialized knowledge; defendant's level of authority in the position; and the level of public trust."  United States v. Shyllon, 10 F.3d 1, 5 (D.C. Cir. 1993), cert. denied, 510 U.S. 1206 (1994).  Moreover, "a position of trust, if any, must be established from the perspective of the victim."  Id. at 5 (emphasis added).

Here, the evidence at trial established that defendant represented himself as a legitimate financial advisor.  He convinced his victims that he himself was a successful investor and had acquired specific expertise in making investments.  In fact, defendant repeatedly told investors that he was a graduate of Howard University's business school and he told at least one victim – Dr. Melody Ivory – that he had "worked on Wall Street."  See testimony of Melody Ivory.  He often referred to his official position, "president and CEO" of First United Financial Group.  Moreover, defendant distributed literature which touted his qualifications and abilities as a financial advisor.  See, e.g., Gov't Trial Ex. 18 ("The Vision"/"The Visionary"), Ex. 24 ("Investment Memorandum,

the Trinidad Project"), Ex. 28d (defendant's business card describing FUFG as "A Realty and Investment Consulting Firm").[7]

The commentary for section 3B1.3 provides that the abuse of trust enhancement is warranted in cases where the defendant "provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not." U.S.S.G. § 3B1.3, cmt. n.2. As an example of such false pretenses, the commentary cites the case of a defendant who "perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker." Id. In this case, the defendant's conduct is a mirror image of the example set forth in the commentary. Defendant consistently held himself out to FUFG investors as a person with superior knowledge of investing and finances. Virtually every victim/investor at some point during their testimony stated that they initially believed defendant, relied on his representations that he was experienced and knowledgeable in financial affairs, and trusted him with their hard earned money. Moreover, defendant perpetrated his scheme by giving himself sole discretion over the victim's funds. Since the defendant owned FUFG and served as its CEO, there was no oversight of the defendant's handling of investment funds. Indeed, Mr. Hall – by his own admission – enjoyed complete and unfettered discretion over all business affairs at FUFG.

Numerous courts faced with a similar set of circumstances have applied the § 3B1.3 enhancement in situations involving brokers or financial advisors. See, e.g., United States v. Hart, 273 F.3d 363, 377-78 (3d Cir. 2001) (stockbrokers occupy a position of trust); United States v. Bollin, 264 F.3d 391, 415-16 (4th Cir. 2001) (abuse of position of trust exists where defendant

---

[7] Indeed, defendant in his own testimony stated that FUFG's primary focus was to educate people with limited financial experience about financial matters.

falsely represented himself as an experienced broker and caused that impression to be extended to investors); United States v. Davuluri, 239 F.3d 902, 909 (7th Cir. 2001) (position of trust exists where victims provide defendant with broad discretion to invest on their behalf and the victim believes that the defendant will act in the victim's best interest); United States v. Hirsch, 239 F.3d 221, 227-28 (2d Cir. 2001) (abuse of trust enhancement applies where investment advisor was entrusted with investment discretion by his investors and where there was a fiduciary and personal relationship with investors); United States v. Reeves, 255 F.3d 208, 212 (5th Cir. 2001) (position of trust exists where defendants presented themselves as financial planners and defrauded victims by persuading them to turn over money to be invested in sham companies); United States v. Iannone, 184 F.3d 214, 224 (3d Cir. 1999) (position of trust exists where defendant's "position as head of a company in which the victims invested made his fraud difficult to detect, vested him with significant authority over the victim's investment monies, and encouraged his victims to rely on his perceived integrity"); United States v. Lowder, supra, 5 F.3d at 473 (president of a bogus financial company who was entrusted with the ability to spend the investors' money without any oversight held a position of trust).

Defendant falsely presented himself and his company as a legitimate investment advisor and used this representation to perpetuate his fraud scheme. Accordingly, a two level enhancement applies for abuse of a position of trust.

D. Defendant's use of sophisticated means merits a two level enhancement.

Section 2B1.1(b)(8)(C) provides a two level increase if the offense involved the use of sophisticated means. See U.S.S.G. § 2B1.1(b)(8)(C) (2002). Such circumstances may exist "even if each step in the scheme was not elaborate," so long as "the total scheme was sophisticated." United

States v. Jackson, 346 F.3d 22, 25 (2d Cir. 2003), *vacated on other grounds sub nom.*, Lauersen v. United States, 541 U.S. 1044 (2005).  The Guideline commentary defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense" and explains that it could include conduct "such as hiding assets or transactions or both, through the use of fictitious entities, corporate shells, or offshore financial accounts."  U.S.S.G. § 2B1.1(b)(8)(C) cmt. n.6(B).

Mr. Hall leased a virtual office space at 1050 Connecticut Avenue, N.W.  See Gov't Trial Ex. 40 (photograph of 1050 building).  Defendant, however, conducted very little, if any, business at this address.  In fact, nearly 100% of the defendant's operations occurred out of his home at 240 Parker Street, N.E..  A search warrant of the Connecticut Avenue office established that there were very few FUFG documents or other materials at the Connecticut Avenue location.  Yet, the defendant used the Connecticut Avenue address on written correspondence, marketing materials, and on at least one occasion, to lull a complaining investor into reinvesting with FUFG.  See Testimony of Officer William McClain.  These activities show that the defendant held the Connecticut Avenue office space purely for the purpose of luring potential investors so that he could perpetuate his fraudulent scheme.

In addition to leasing virtual office space to fool investors into believing that his fraudulent scheme was a legitimate investment group, the defendant also used phony office addresses in Chicago, New York, and Los Angeles despite the fact that defendant had no offices in any of these locations.  See Gov't Trial Ex. 4a ("About Us").  Defendant's operations took place solely at his 240 Parker Street, N.E. residence.  By actively using multiple fictitious office addresses, defendant created the sophisticated means by which he carried out the fraud scheme.

Defendant also created what were essentially shell companies to advance his scheme. In addition to FUFG – which did no legitimate business but rather existed only to advance defendant's fraud scheme – defendant created another company named United Construction. On numerous occasions, the defendant told investors that United Construction would be responsible for the renovation of FUFG-owned properties. See, e.g., testimony of Melody Ivory, Tr. 2/23/06, pp. 26-27. According to several trial witnesses, defendant told investors that his ownership of United Construction would lead to a dramatic decrease in costs associated with construction and renovation. The decrease in costs would then lead to higher returns on their investments. See, e.g., testimony of Kimberly Williams. In truth and in fact, United Construction was responsible for very little, if any, actual construction projects. See testimony of Edwin Ghingoree, Tr. 2/13/06, p. 59. Mr. Ghingoree's testimony established that defendant's creation of United Construction was nothing more than an elaborate means of perpetuating his fraud.

Defendant employed various other devices in an effort to impede discovery of the existence and extent of his ongoing fraud. For instance, defendant failed to file any state or federal taxes for himself or for FUFG during any of the three years of the scheme. See Gov't Trial Exhibits 28b, 28c. In addition, defendant failed to maintain any financial records or to generate a single financial statement during the two and one half years that FUFG was operational. Moreover, defendant, on numerous occasions, used cash to cover payroll and other expenses. While these activities may appear to be relatively simple and unsophisticated, defendant's deliberate failure to engage in record keeping activities allowed him to continue his scheme without being detected by a law enforcement. See United States v. Furkin, 119 F.3d 1276, 1284-85 (7th Cir. 1997) (holding that the defendant's conduct relating to the everyday operation of the business, such as using fictitious names, failing to

keep records concerning income, destroying records, using cash to buy equipment, failing to tell his accountants of the cash purchases, and failing to keep an inventory of equipment was a sufficient basis for the court to impose the sophisticated means enhancement).

Significantly, even though each step in the defendant's scheme on its face may not in itself be extraordinarily sophisticated, each of the devices employed by defendant contributes to the total sophistication of the defendant's fraudulent scheme. See United States v. Jackson, supra, 346 F.3d at 25 (holding that the enhancement is appropriate even if each step in the scheme was not elaborate, so long as the total scheme was sophisticated).

E.  Defendant's Leadership Role in the Scheme Merits a Four Level Enhancement.

A four level enhancement is applicable here because defendant recruited at least four other participants into various parts of his schemes and was a leader of criminal activity that was otherwise extensive as that term is defined by the Sentencing Guidelines. See U.S.S.G. § 3B1.1(c) "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." Id., Application Note 3. In United States v. Wilson, 240 F.3d 39 (D.C. Cir. 2001), the D.C. Circuit addressed the issue of what constitutes "otherwise extensive" conduct: "that § 3B1.1(a) is 'not so much about extensiveness in a colloquial sense as about the size of the organization in terms of persons involved that a defendant 'organize[d]' or 'le[d].' '" Id. at 49 (quoting United States v. Carrozella, 105 F.3d 796, 803 (2d Cir. 1997)).  The district court should then consider the following factors relevant to "the head count": "'(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized by or led by the defendant with specific criminal intent [as opposed to mere

service providers]; and (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme [rather than fungible with others generally available to the public].'" Id. at 50 (quoting United States v. Carrozella, supra, 105 F.3d 803-804)) (bracketed material in original).

Here, over a period of several years during which defendant was perpetrating his Ponzi scheme, he employed – by his own admission – dozens of people at FUFG who assisted him in disseminating false information to investors. At least five of these individuals – Carletus Willis[8], D.G.[9], I.M.[10], M.S.[11], and M.M.[12] – can be considered as knowing "participants" in that each could potentially be held "criminally responsible for commission of the offense." U.S.S.G. § 3B1.1(c), Application Note 1.

"Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed

_____

Mr. Willis – defendant's subordinate employee – pleaded guilty to conspiring with defendant Hall in connection with this scheme. On June 1, 2006, the Court sentenced Willis pursuant to the government's 5K motion for downward departure.

D.G. worked at FUFG in the information technology office. Defendant called D.G. as a defense witness at trial and D.G. asserted his fifth amendment privilege against self-incrimination.

I.M. was Chief Technology Officer and was privy to what investors were and were not being paid pursuant to the terms of their agreements with FUFG. I.M. asserted his fifth amendment privilege against self-incrimination in connection with his appearance as a witness before the SEC.

M.S. solicited and recruited potential FUFG investors on defendant's behalf. M.S. engaged in lulling activities with investors. See Testimony of Walter Boone. M.S. asserted her fifth amendment privilege against self-incrimination in connection with aspects of her appearance as a witness before the SEC.

M.M. was nominally Chief Financial Officer. M.M. also solicited FUFG investors and was an authorized co-signer on at least one of the FUFG bank accounts.

right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." Id., Application Note 4. Each of these factors weighs heavily in favor of applying the four level enhancement.

First, by his own admission, defendant exercised unfettered decision making authority at FUFG. Tr. 2/28/06, pp. 20-21. Defendant was FUFG and FUFG was Robert Hall. Second, while defendant was the principal participant in these criminal offenses, other participants and individuals were his subordinates who, for the most part, he co-opted to do his criminal bidding. The evidence established at trial that there were so many Asset Placement Agreements and so many investors to deal with, that these employees were "peculiar and necessary" to the Ponzi fraud scheme "rather than fungible with others generally available to the public." See United States v. Wilson, supra, 240 F.3d at 50. Indeed, there is evidence that defendant directed employees to work well beyond regular business hours.[13] See generally United States v. Strothers, 77 F.3d 1389, 1393-94 (D.C. Cir. 1996) (affirming upward supervisory adjustment for two conspirators who "directed and profited from numerous drug sales carried out by subordinate 'runners' ").

Third, defendant recruited FUFG employees to assist him in carrying out his scheme. Defendant had full control over the hiring process, full control of the finances, and full control of all business decisions and directives. The fact that not every one of these employees knew the full scope of defendant's scheme is not determinative. See United States v. West, 942 F.2d 528, 530-531

---

The Court will recall Mr. Willis's testimony that he often worked long into the night and then started anew very early the next morning at the 240 Parker Street offices. Tr. 2/15/06, pp. 72-73.

(8th Cir. 1991) ("otherwise extensive" enhancement may include "'outsiders' who did not have knowledge of the facts").

Fourth, defendant claimed not simply the largest share of the proceeds but, as far as we know, defendant claimed the entire share of his criminal proceeds. There is no evidence that defendant "spread the wealth" among others. Indeed, the evidence at trial established that defendant failed even to properly pay his FUFG employees as the law requires.[14] In the perverse world defendant created, he recruited people to assist him in perpetrating his various frauds and then failed to even pay them their agreed upon wage.

Finally, as set forth throughout this memorandum, the scope of defendant's criminal conduct stretched over the course of years and directly touched the lives of many innocent victims. Cf. United States v. Rose, 20 F.3d 367, 374 (9th Cir. 1994) (fraud scheme "involved approximately $3 million, sixty knowing or unwitting employees . . ., and untold but no doubt considerable number of bank employees and other outsiders, and scores of duped investors").

Defendant well deserves the four level enhancement for his leadership role.

F.    Defendant's blatant perjury at trial merits a two level enhancement

Because defendant testified falsely under oath at trial, the Court should apply a two-point enhancement pursuant to U.S.S.G. § 3C1.1, Obstructing or Impeding the Administration of Justice. U.S.S.G. §3C1.1 provides,

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct

---

Lamont Bessicks testified that he was not receiving a paycheck or that paychecks he did receive bounced. Tr. 2/13/06, p. 100. Defendant's coconspirator Carletus Willis also testified that he too was not paid regularly by defendant. Tr. 2/15/06, p. 56.

related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

While a denial of guilt is not, in itself, sufficient to trigger this enhancement, false testimony under oath during a court proceeding will. Application Note 4(b) of U.S.S.G. § 3C1.1 states that an example of conduct to which this enhancement applies is "committing, suborning, or attempting to suborn perjury." In determining whether this enhancement applies, the D.C. Circuit has set forth a three point standard: "whether the defendant testified (1) falsely, (2) as to a material fact, and (3) willfully in order to obstruct justice, not merely inaccurately as the result of confusion or a faulty memory." United States v. Thompson, 962 F.2d 1069, 1071 (D.C. Cir. 1992), cert. denied, 507 U.S. 974 (1993). Application of this enhancement requires a greater showing than a mere preponderance of the evidence; "the clear and convincing [evidence] standard is the appropriate standard by which to evaluate defendant's testimony for section 3C1.1 perjury enhancements." United States v. Montague, 40 F.3d 1251, 1254 (D.C. Cir. 1994).

Here, there is clear and convincing evidence that defendant testified falsely under oath at the trial in an intentional and unabashed effort to deceive the jury. There are numerous examples of blatant perjury on facts and issues that range from the sublime to the outright silly. First and most central, defendant, under oath, unequivocally denied that he ever knowingly lied to or intentionally defrauded any investors. The jury's verdict -- in which it concluded in less than a full day of deliberations that defendant was guilty beyond a reasonable doubt of the entire indictment -- belies defendant's denial of the offenses under oath at trial and establishes, at least by clear and convincing evidence, knowing and intentional falsity as to a material fact.

There are abundant other examples of false and/or intentionally misleading testimony throughout defendant's testimony.  For example:

- Defendant testified that he never told any investor that he was a graduate of Howard University.  Tr. 2/28/06, p 17.  Numerous investors testified otherwise.

- Defendant denied telling investors that he would invest their money exclusively in real estate in D.C.  Tr. 2/28/06, p. 62.  Numerous investors testified otherwise.

- Defendant denied that he ever told Dr. Melody Ivory that he owned 229 Parker Street, N.E.  Tr. 2/28/06, p. 100.  Dr. Ivory testified otherwise.

- Defendant denied that he ever told Dr. Ivory the agreements were unenforceable because they called for the payment of usurious rates of interest.  Tr. 2/28/06, pp. 165-166.  Dr. Ivory testified otherwise.

- Defendant testified that he wrote checks that had a sufficient ledger balance to cover their payment by the bank.  E.g., Tr. 2/27/06, pp. 93-96.  The evidence established that defendant wrote almost 200 checks that lacked the requisite ledger balance to pay them.  Gov't Trial Ex. 3c (summary chart, FUFG transaction involving insufficient funds).

Each of these statements is demonstrably false as to a material fact and each establishes, by clear and convincing evidence, defendant's willful obstruction of the criminal justice process to skew the result in his favor.  See United States v. Gaviria, 116 F.3d 1498, 1519 (D.C. Cir. 1997) (affirming application of § 3C1.1 enhancement for perjury because "there is no evidence in the record that [defendant] was confused, mistaken or forgetful about the scope of his participation in the conspiracy"); United States v. Washington, 106 F.3d 983, 1017 (D.C. Cir. 1997) (affirming

application of § 3C1.1 enhancement for perjury where defendants' lies under oath were material and were intended to mislead).  See generally United States v. Contreras, 937 F.2d 1191, 1196 (7th Cir. 1991) ("When a defendant decides to take the stand and lie, he runs even more risks, including the chance of an increased sentence.") (emphasis in original).

Defendant has the absolute right to test the government's proof at trial and testify in his own behalf.  He does not, however, have any authority to sully the dignity of the United States District Court in an effort to evade accountability for his misdeeds.[10]  Accordingly, defendant's offense level should be increased two points for his blatant perjury at trial.

III.  **Defendant should be sentenced at the top of the applicable Guideline range.**

Defendant should be sentenced at the top of the applicable Guideline range for two principal reasons.  First, defendant was convicted of very serious crimes against dozens of victims, many of whom were extremely vulnerable to defendant's overtures and charm.  In determining the appropriate sentence, the Court "shall consider . . . the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

Many white collar offenders are opportunists who lack the industriousness to earn a living through hard work.  Defendant, however, is a far more dangerous criminal.  Defendant is an

---

As further evidence that defendant has no respect for the dignity of the judicial process, it is worth recalling that, during his testimony, defendant began laughing during questioning by government counsel.  Tr. 2/28/06, p. 171.  The Court will also recall that *on two separate* occasions defendant appeared late to court and on one occasion conducted a cross-examination of a government witness with a cell phone earpiece dangling from his ear in plain view of the jury.

intelligent and charismatic individual[11] who was afforded many opportunities in life including service in the United States Army and enrollment at Howard University.  Instead of using his gifts and privileges to help other people, defendant worked very hard to identify those individuals whom he perceived to be less knowledgeable and weaker than himself.  He then used his natural abilities to enthusiastically exploit these individuals for maximum personal gain.  Defendant is an economic predator.  He has made a career of preying on people, on betraying their trust, and on assaulting their dignity.  He is an extremely dangerous man who is virtually guaranteed to pick up where he left off as soon as he is released from prison.  A sentence within the applicable Guideline range is severe, to be sure, but defendant's criminal conduct was equally severe.

In considering the seriousness of the offense and what constitutes "just punishment," the government would ask the Court to weigh the feelings of the many victims in this matter and the financial and emotional hardship defendant's conduct has heaped upon them.  Sentencing Exhibit 2, attached hereto, consists of a collection of letters from individuals who did not appear as witnesses at trial but who nevertheless wanted to make their feeling known to the Court before defendant's sentencing.  Sentencing Exhibit 3, attached hereto, is a DVD recording of FUFG victim Ederle Brooks of Washington, D.C.  Ms. Brooks had expressed her strong desire to attend defendant's trial and make a personal statement to the Court but, as the Court will learn from her recorded statement, is unable to do so because of serious health problems.

Second, in fashioning a reasonable sentence in this case, the Court must also consider "the need for the sentence imposed – to protect the public from further crimes of the defendant."  18

---

Defendant represented himself very effectively at trial, conducting cross-examinations and making factual and even legal arguments that would be expected from seasoned trial practitioners.

U.S.C. § 3553(a)(2)(C). A sentence within the 235-293 month Guideline range achieves this important objective. Absent law enforcement intervention, there is little question that defendant would have continued lying to and cheating innocent investors for many more years. At no time during this entire proceeding has defendant ever acknowledged any wrongdoing or expressed any contrition or remorse for his conduct. To the contrary, defendant has *blamed his victims* for allegedly not understanding that their investment with FUFG involved risk. Defendant's conduct would be at least somewhat less reprehensible if he would simply accept responsibility and attempt to make amends to those whose trust he has betrayed. Even after a jury returned a guilty verdict on all counts of the grand jury indictment, and in the face of overwhelming evidence, defendant steadfastly continues to deny his intention to defraud anyone. The bottom of the Guideline range should be reserved for those who demonstrate true remorse for the harm they have caused. Defendant is clearly not a candidate for rapid rehabilitation.

Indeed, there is absolutely every indication that, given a shorter sentence, defendant would simply continue to defraud people and wreck lives. As proof of this, the Court need look no further than defendant's interactions with potential investor Mr. WAV to whom defendant promised a 100% rate of return in five months on WAV's $100,000 investment with defendant.[12] What makes this episode so telling, however, is the fact that defendant attempted to perpetrate this fraud <u>in December of 2005, *while he was on pre-trial release in this case.*</u> In sentencing defendant to a sentence within

---

Following the guilty verdict, the government furnished the Court with a copy of this signed promissory note to support its argument that defendant should be held without bond pending sentencing. We do not attach an additional copy here in order to protect the privacy interest of WAV.

the 235-293 month Guideline range, the Court can protect the community from defendant's harm for a significant period of time.

Defendant's propensity for dishonesty and predatory conduct – his lack of criminal record notwithstanding – is well established. At trial, the Court heard evidence of defendant's scheme to defraud his fellow students at Howard University in the late 1990's. Indeed, defendant was disciplined by Howard University after a finding that he engaged in this scheme.[13] The Court will also recall evidence introduced a trial that defendant filed and paid no federal income taxes in 2000, 2001, 2002, or 2003. See Gov't Trial Exhbits 28b and 28c. Defendant's duplicitous nature and self-absorption is fully exposed by the fact that he beseeched others – in the name of God[14] – to pay the taxes they owed to the government. See Gov't Trial Ex. 4b (The Principle, A Primer for Ministries, Tax Strategies). Defendant's tax strategy – which applied only to himself – was to pay no taxes.

Put simply, defendant is a very sophisticated and very dangerous criminal. The only sure way to protect the public from future harm is by imposing a sentence within the 235-293 month Guideline range. The Court need not indulge in the high risks associated with a lesser period of incarceration.

IV. **Restitution and Criminal Forfeiture**

---

At trial, defendant pointed out that this finding was eventually overturned. The reason the finding was overturned, however, was that there was no transcript of the proceeding rather than being overturned on substantive grounds or contrary evidence that exonerated defendant.

The Court will recall that defendant frequently invoked religion in situations where he believed that it would help him advance his scheme. Indeed, the evidence at trial strongly suggested that defendant targeted Baptist churches in D.C. and elsewhere. See Gov't Trial Ex. 33 (computer generated list of Baptist churches in D.C. found during execution of the search warrant at defendant's office).

The Court should order the defendant to pay restitution to his victims in case number 05-30 in the aggregate amount of $713,924.[15]  These monies are due to multiple victims as set forth in the government's evidence at trial.  (See Gov't Trial Exhibits 1a, 44.)  In case number 06-004, the Court should order the defendant to pay restitution to Sterling Trust Company of Waco, Texas, in the amount of $90,000, less any amounts received by Sterling to date as part of its settlement agreement with Anthony Rivera and Developers, Incorporated.[16]

At trial in 05-30, following the forfeiture phase of the trial, the jury returned a special verdict in which the jury found that $747,169 constitutes, or is derived from proceeds traceable to the wire and mail fraud scheme in the grand jury indictment.  On July 5, 2006, the Court entered an order of forfeiture that reflects this verdict.  The government further requests that the Court verbally pronounce this forfeiture as part of defendant's sentence and that it attach the forfeiture order to the judgment and commitment order.

During his guilty plea in case number 06-004, defendant conceded the forfeiture allegation of the indictment but he did not agree to the amount of the forfeiture which is set forth in the indictment as $90,000.  This $90,000 represents the sum of money equal to the total amount of money constituting, or derived from, proceeds traceable to the offenses of bank fraud and mail fraud.  Defendant likely will maintain that the forfeiture amount should be reduced by the amount he has already paid to Sterling pursuant to a settlement agreement.  While the Court can reduce the amount of *restitution* it orders by this amount, criminal forfeiture is an entirely different matter that should

---

Again, this is a highly conservative figure which has recently been reduced in order to give defendant every benefit of the doubt concerning who was a victim for purposes of restitution.

Mr. Rivera has been separately charged with fraud offenses against Sterling and is awaiting trial.

not be offset by any amounts defendant may have already paid in restitution.[17]   Accordingly, the

Court should enter a forfeiture order declaring $90,000 forfeited to the United States pursuant to 18

U.S.C. sec. 982(a)(2)(A) and 982(b)(1) and make this forfeiture part of its verbal pronouncement at

sentencing.

V. **Conclusion**

For the reasons set forth herein, defendant's offense level is 38 and a sentence is within that

range is eminently reasonable.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
D.C. BAR # 498610


By:    _____

STEVEN J. DURHAM
JORDAN A. THOMAS (D.C. Bar #452886)
ASSISTANT UNITED STATES ATTORNEYS[18]
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 514-8316, (202) 551-4475

---

In ordering forfeiture in the full amount alleged in the indictment, it is worth noting that the source of defendant's payments to Sterling pursuant to the settlement agreement is not derived from Hall or Rivera personally but rather the source of these payments are from Hall's "non-profit" business organization Hope 7, Inc.  The ultimate source of these payments is of course from individual investors of Hope 7.

The government gratefully acknowledges Arian June, at the time a third year law student at the University of Pennsylvania, who assisted in the research and drafting of this memorandum.