# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Cr. # 05-0030-01 (HHK)** |
| ) | **Cr. # 06-04-01 (HHK)** |
| **ROBERT L. HALL, JR.** ) | |
| _____ ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Robert L. Hall, Jr., through counsel, Elise Haldane, respectfully submits this memorandum for the Court's consideration at his sentencing in the above-referenced cases.

### *Procedural History*

Robert L. Hall, Jr. is before Court for sentencing following his conviction by a jury in criminal case #05-30 (HHK) and his plea of guilty in criminal case #06-04 (HHK).[1]

Criminal case #05-30 (HHK), in which Mr. Hall represented himself at trial, involved an investment company, First United Financial Group (FUFG) organized and operated by Mr. Hall. The jury found Mr. Hall guilty of wire fraud, mail fraud, securities fraud, and fraud in the first degree for activities occurring between February 1, 2001 and October, 2003.

---

[1] In a "straight-up" plea to the indictment, Mr. Hall pled guilt to ten substantive counts of the eleven count indictment, and entered a plea pursuant to <u>North Carolina</u> v. <u>Alford</u>, 400 U.S. 25 (1970) on count 1–conspiracy.

Criminal case #06-04 (HHK) involved a check-kiting scheme perpetrated by Mr. Hall in September of 2003.

### *Defendant's Background*

Robert Hall is a thirty-three year old man who was raised with his two sisters in Utica, New York. When he was three years old, Mr. Hall's father went to prison. Due to illness, his mother was unable to care for her children consistently. From age three to nine, Mr. Hall spent intermittent periods in foster homes. From age ten to eighteen, he and his sisters remained in foster care. Fortunately, they were placed together.

As a high school student, Mr. Hall's goal was to be a pediatric nurse. After witnessing his grandmother's final illness at age 17, he changed his mind, and decided to enlist in the Army. He spent four years in the military – roughly one-third of his adult life-- received an honorable discharge. He was a paratrooper; his assignments included the occupation of Haiti and a stint in Korea.

Following his discharge from the Army, Mr. Hall eventually came to the District of Columbia to participate in the Million Man March. For a period of time, he played the saxophone on street corners in Georgetown. He then applied to Howard University and was accepted into the business school beginning in the fall of 1996.

As a twenty-three year old freshman at Howard, Mr. Hall involved himself in a multitude of campus activities. He worked as a student assistant in the President's Office,

was president of the freshman class, and was selected to be the homecoming king in 1997.

He started an entertainment booking agency business in the summer of 1997.   He and a friend also started an investment group to support delivery services from Circuit City.  The group[2] hired an attorney to draft the agreement, and paid for a truck and uniforms for the drivers.  The plan failed, and the group lost about 60% of its investment.  Two investors complained, and Mr. Hall and his friend were sanctioned.  The case was overturned on appeal.

In 1997, Mr. Hall became seriously involved with another Howard student, Cassandra Thomas.  Their daughter Malaika was born July 29, 1998.

Mr. Hall was chosen to be Homecoming Chairman for Howard's 1999 fall event.  The job involved a budget of $350,000, a salary of $14,000, and incredible pressure.  He worked full time on the homecoming event, and "never went to class in the spring, and tanked in the fall."  The stress he experienced during this time is documented in his Veterans' Administration medical records.[3]

Faced with the responsibility of a child and his continuing sense of responsibility for his mother and sister[4], Mr. Hall left Howard and began to work as a mortgage loan officer

---

[2]About twenty people invested $800 each.

[3]The VA records, as well as other sentencing materials, will be submitted in a sealed Appendix to be filed with the Court.

[4]At age sixteen, his sister Diadra was diagnosed with the same illness as his mother has.

in order to provide for his family.   His first goal was to provide homes for his family.

After thirteen months of research and negotiations, Mr. Hall purchased a house for Ms. Thomas, the baby and himself, as well as a duplex in New York for his mother and sister. When his job as a mortgage loan officer ended, he decided to become a real estate consultant for buyers; and began trading stocks for himself.

The market was strong, and Mr. Hall was successful.  He traded stocks for a friend, and expanded to trade for other investors.  He then began to look for real estate investments (and investors).  First United Financial Group followed.

As was set forth at length at trial, FUFG failed.  Ultimately, Mr. Hall was unable to pay back the investors from the real estate investments he contemplated, and, as he admitted at trial,  he used new investors' money to pay earlier investors.

Simultaneously, Mr. Hall became involved in the Advisory Neighborhood Commission.  First elected as a commissioner, he also served as its treasurer.  He also founded Hope 7, a project which involved the renovation of property for ownership by renters who could now otherwise afford to purchase their own apartments.  The project has been approved by the zoning commission.

By  2003, Mr. Hall found himself in a dire financial situation.  In April,  2003  he sold his house to Bryndan Moore, an investor acting on behalf of himself and other investors in

4

FUFG.[5]   Mr. Hall testified at trial that Mr. Moore received over $100,000 of the proceeds.

(Trial Transcript 2/27/06, p. 32), as well as additional proceeds when the property was sold

in 2004.  The money was not enough to satisfy his obligations.  The check-kiting scheme to

which he has pled guilty followed.[6]

As stated in his letter to the Court,[7] Mr. Hall is well aware of the implications of the

check-kiting scheme, and is abundantly aware of the legal  morass he created with FUFG.

Although he thought that his ability to work hard and think through problems would enable

him to prevail, he now understands why the jury convicted him of a Ponzi scheme.

### Sentencing Considerations

In the wake of United States v. Booker, 543 U.S. 220 (2005), the Court is able to

sentence Robert Hall with the  advice  but  without  the  restrictions of   the Sentencing

Guidelines.  Other factors to be considered include: the nature and circumstances of the

offense and the history and characteristics of the defendant; the need to promote respect for

the law and to provide just punishment; deterrence to criminal conduct; protection of the

public from further crimes; educational, vocational training and medical care; the need to

---

[5]See Appendix, HUD-1 form.

[6]The Alford plea was the result of Mr. Hall's belief that he was, and is, the party responsible for the check-kiting scheme.  He has admitted that he used others to effect the scheme, but is not able to stately honestly that he conspired with anyone else.  As the Court isd aware, the trial United States v. Anthony Rivera, Cr. #06-04-02 (HHK) ended in a mistrial.

[7]See  Appendix.

avoid unwarranted sentencing disparities and to provide restitution to the victims.  In light

of the government's Sentencing Memorandum, this pleading will first address the advisory

factor – the Sentencing  Guidelines

### *Guidelines Calculations*

_____Mr. Hall's base offense level in Cr. # 05-30, pursuant to USSG §2B1.1(a) is 6.

According to the government, the loss to the victims was either $747,169.00 (PSR, p. 111, ¶57)

or $713,924.00 (PSR, p. 21).[8]  Two points were added for sophisticated means, four points for

the number of victims (72), four points for role in the offense, two points for abuse of a

position of trust, and, finally, two points for obstruction of justice–resulting in an offense

level of 34, for which the guideline range is 151-188 months.  The government seeks an

additional four points for loss to the victims – resulting in a guideline calculation of 235-293

months.

### *Calculation of Loss Amount*

According to the 2002 Sentencing Guidelines, the amount of loss should be calculated

as the actual amount of loss – the  total amount of money invested, minus any sums  repaid

to investors, exclusive of interest.   The loss cannot be reduced by any repayment in excess

of the original investment.

_____

[8]As stated infra, the amount should be increased by $90,000 – the loss in Cr. # 06-04
(HHK).

In its Consolidated Memorandum in Aid of Sentencing (#70 in Cr. #05-30), the Government argues that Mr. Hall is not entitled to any credit against losses (p. 5), and cites numerous cases in support of its proposition that the loss should include the promised rate of return of which the FUFG investors were deprived (pp. 8-11), adding an additional four points to the base offense level.  According to the government's calculations, the total loss amount should be over $2.5 million dollars, rather than the sum of $713,924 .00 which it provided to the presentence writer.[9]

The government's arguments are based upon cases which predate a substantive change in the guidelines which went into effect on November 1, 2001.  Prior to that time, the subjects had caused a split in the Circuits.  See, e.g. United States v. Turpin, 1177 F.3d 678 (2nd Cir. 1997) (in absence of sentencing guideline, the district court could "go either way" on the 1990s value–for sentencing purposes--of a stolen Chagall painting which the defendant had purchased in 1978 for $100,000.00).

USSG § 2B1.1 (2002), Application Note 2 states, in pertinent part:

2.  Loss under Subsection (b)(1)

This application note applies to the determination of loss under subsection (b)(1)

A.  General Rule – subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss. . . .

_____

[9]The amount differs from the sum of $747,169.00 which was provided to the Court and jury during the forfeiture phase of the trial.  (Trial Transcript, 3/3/06, p. 17)

D. <u>Exclusions from Loss</u> – Loss shall not include the following:

(ii) interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon rate of return, or other similar costs . . . .

E. <u>Credits Against Loss</u> – Loss shall be reduced by the following:

(i) The money returned . . . by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a government agency.

F. <u>Special Rules</u> – Notwithstanding subdivision (A), the following special rules shall be used to assist in determining loss in the cases indicated: . . . .

(iv) <u>Ponzi and other Fraudulent Investment Schemes</u>:

In a case involving a fraudulent investment scheme, such as a Ponzi scheme, loss shall not be reduced by the money of the value of the property transferred to any individual investor in the scheme in excess of the investor's principal investment (<u>i.e.</u> the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme.

The amendment of the Guidelines in 2001 frankly eviscerates the government's argument. Further, the authorities cited by the government which post-date the Guideline change are inapposite. While <u>United States</u> v. <u>Aptt</u>, 354 F.3d 1269, 1278 (10th Cir. 2004) (Govt. Sent. Memo. at 9) did involve a Ponzi scheme, the trial court applied the 1995

8

sentencing guidelines. The appellate court held that the substantive 2001 changes to the Guidelines did not qualify for retroactive application. Citations to the decisions of this circuit are equally inappropriate. United States v. Bae, 250 F.3d 774 (D.C. Cir. 2001), a case from this circuit which predates the change in the Sentencing Guidelines, involved a question of the fair market value of fraudulently obtained lottery tickets. United States v. Bolla, 346 F.3d 1148 (2003) involved application of §2F1.1, application note 8 of the Guidelines. That section was deleted in the November 2001 revision of the Guidelines.

Mr. Hall does not seek a reduction in loss based upon interest paid to the investors in excess of the original investment. He seeks a reduction based upon the amounts repaid to investors up to the amount of their original principal investment. The government is uniquely positioned to provide accurate calculations of the loss. Rather than doing so, the government argues for an addition of over 9 years to Mr. Hall's sentence.

*Acceptance of Responsibility*

In the second case, Cr. #06-04 (HHK), Mr. Hall entered a plea to all counts of the indictment without the benefit of a plea offer. As the Court is aware, his Alford plea to the count of conspiracy is a guilty plea. The reason that he entered the Alford plea was that he did not conspire with Anthony Rivera and Thomas Alston to commit the crimes to which he pled. He used them effect his scheme.

The defense submits that Mr. Hall should receive credit for acceptance of responsibility

in the second case.

*Other Sentencing Enhancements*

In addition to the loss enhancement, the presentence report adds ten points to the Guidelines calculation–sophisticated means (2 points), 50 or more victims (4 points), abuse of a position of trust (2 points), and obstruction of justice (testimony at trial) (2 points).  As a result, the guideline range of 51-63 months leaps to 151-188 months.

While each of the enhancements are arguable, the draconian results are insupportable. As stated in United States v Jackson, 346 F.3d 2 (2d Cir. 2003), *aff'd on rehearing* in United States v. Lauersen, 362 F.3d 160 (2d. Cir. 2004), "even though these enhancements are sufficiently distinct to escape the vice of double counting, they substantially overlap.  Most fraud schemes that obtain more than one-half million dollars involve careful planning, some sophisticated techniques, and are extensive."  See, also United States v. Gigante, 94 F.3d 53, 56, 56 (2d Cir. 1996) (downward departure appropriate where sentence results fro series of enhancements proven only by a preponderance of the evidence).

*Post-Booker Analysis*

**Sentencing Disparities**

The government's proposed sentence is in the range of corporate executives whose actions caused the loss of hundreds of millions of dollars.  Bernie Ebbers, CEO of WorldCom, was sentenced to twenty-five years, as was Enron executive Jeffrey Skilling.  Adelphia

founder and CEO John Rigas (age 80) received a 15 year sentence for fraud involving billions of dollars. His son Timothy Rigas was sentenced to 20 years. Tyco executive Dennis Kozlowski's was sentenced to 8.5 – 25 years for financial crimes involving an estimated 134 million dollars.

Robert Hall is not in the same league as these corporate executives. His goal was to make money to care for himself and his family while helping others. When the failure of FUFG was looming, he resorted to large-scale check kiting in order to dig himself out of the hole. His actions have cost him his freedom. Nonetheless, he has consistently made efforts to repay investors.

**History and character of the defendant**

The defense does not seek to minimize the seriousness of Mr. Hall's actions. The hardship that he has visited on others is apparent to him as well as all parties involved. Nonetheless, his substantial record of positive achievements are considerable.

He has served this country honorably for four years in the United States military. He overcame a difficult childhood and supported his family to the best of his ability. He actively participated in church and community affairs. His completion of the Hope 7 project during a period of substantial legal and financial difficulties attest to his continuing desire to contribute to his community. After the search warrant was executed in this case, he continued to make efforts to repay investors until his incarceration in this case. In the second case, he

made restitution payments in the amount of $36,500 to Sterling Trust prior to his incarceration.

### Concurrent Sentencing

The defense submits that the sentence in both cases should run concurrently.

The government appropriately elected to indict Mr. Hall separately in Cr. # 06-04 in order to include Anthony Rivera and Thomas Alston in the second case. Absent the election, Mr. Hall's charges would have been grouped for sentencing purposes.

### CONCLUSION

The defense respectfully submits that the goals of sentencing can be accomplished with a sentence which is a fraction of the decades which the government has urged the Court to impose. A shorter sentence will achieve the goals of deterrence, just punishment and rehabilitation while providing the opportunity for substantial restitution to the investors.

Respectfully submitted,


_____/s/_____
Elise Haldane #242826
303 E Street NE
Washington, DC 20002
202/659-8700

12